IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Toledo Museum of Art, | Case No. 3:06 CV 7031 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Claude George Ullin, et al., | |
| Defendants. | |

**INTRODUCTION**

This case involves competing claims of ownership of a painting by Paul Gauguin entitled "Street Scene in Tahiti" (the Painting). Plaintiff, the Toledo Museum of Art (TMA), has had continuous ownership of the Painting since 1939. Defendants are the heirs of Martha Nathan, a prior owner of the Painting. Martha Nathan was a Jewish woman born in Germany who sold the Painting in 1938 to a group of European art dealers who in turn sold the Painting in 1939 to TMA.

TMA has moved to dismiss Defendants' claim of ownership alleging the claim is barred by Ohio's four-year statute of limitations governing conversion of personal property. Defendants allege that (1) this lawsuit does not sound in conversion but rather is a declaratory judgment action which is not barred by the statute of limitations (or laches) and (2) TMA voluntarily waived its statute of limitations defense.

This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court also has authority to grant declaratory judgment, as requested by both parties, pursuant to 28 U.S.C.

§§ 2201(a) and 2202. In determining the propriety of a declaratory judgment, this Court considers the five factors set forth in *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 968 (6th Cir. 2000):

1. whether the judgment would settle the controversy;

2. whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;

3. whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;"

4. whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and

5. whether there is an alternative remedy that is better or more effective.

This case satisfies each of the five factors. A declaratory judgment will settle the controversy of ownership of the Painting and clarify the legal rights of the parties. There is no indication this proceeding is being used for ulterior purposes, will increase friction between federal and state courts, or bypasses a more effective remedy. Therefore, a declaratory judgment is appropriate.

### MOTION TO DISMISS STANDARD

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the function of the Court is to test the legal sufficiency of the claims. The Court is required to accept the allegations stated in the pleading as true, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), and take the alleged facts in the light most favorable to the claimant. *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir. 1976). In considering a motion to dismiss the Court may consider "materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice." *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003). The Court is without authority to dismiss the claims unless it can be demonstrated beyond a doubt that Defendants can

prove no set of facts that would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Westlake,* 537 F.2d at 858.

**BACKGROUND FACTS**

**History of the Painting**

Martha Nathan was the wife of a prominent art collector, Hugo Nathan. She inherited the Painting and numerous other artworks upon her husband's death in 1922. In his Will, Hugo Nathan indicated his intention that Martha Nathan would someday sell some of these artworks to meet her needs.

In February 1937, Martha Nathan left Germany in order to escape Nazi persecution. She moved to Paris, France where she obtained French citizenship. Around May 1938, she returned to Germany to sell her house. At that time, the Nazi government required her to turn over six paintings remaining in her home to the Staedel Art Institute. The paintings she turned over did **not** include the Painting which she had moved sometime earlier along with other artwork to Basel, Switzerland. She also transported some household goods from Germany to France where she placed them in storage. (These household goods remained in storage until they were later confiscated by the Nazi regime in June 1942.) Martha Nathan moved permanently to Switzerland around 1939.

In December 1938, a year and a half after living in France and before the German occupation of France, Martha Nathan sold some of her artwork, including the Painting then located in Basel, Switzerland. She sold the Painting to three prominent European art dealers, at least two of whom had known her for many years.[1] These two, Justin Thannhauser and Alexander Ball, were German Jews

---

[1] Defendants refuse to acknowledge a "sale," citing the lack of evidence as to negotiation, offer and acceptance, bill of sale, or exchange of consideration, or in the alternative the unconscionability of purchase price (Answer ¶1d). Whether a "sale" occurred is immaterial to the current analysis. Even without a prior "sale," there is no dispute that TMA acquired ownership through an arms length purchase from established art dealers.

3

whose families owned art galleries in Germany until their galleries were liquidated by the Nazi government. They, like Martha Nathan, left Germany to escape Nazi persecution. The third art dealer, George Wildenstein, also was Jewish but not German. In December 1938, the three purchased the Painting from Martha Nathan for 30,000 Swiss Francs (approximately U.S. $6,900).

In short, this sale occurred outside Germany by and between private individuals who were familiar with each other. The Painting was not confiscated or looted by the Nazis; the sale was not at the direction of, nor did the proceeds benefit, the Nazi regime. Several months later, in May 1939, TMA purchased the Painting from Wildenstein & Co. for U.S. $25,000. TMA has had the Painting on display in Ohio and internationally since 1939 with Martha Nathan noted as prior owner.

Following World War II and the fall of the Nazi regime, Martha Nathan pursued claims for her wartime losses that resulted from Nazi persecution including the exit tax she paid, the sale of her home for less than its fair market value, the six paintings she turned over to the Staedel Art Institute and the household items she left in storage in France. Martha Nathan continued to live in Switzerland until she died in 1958 at the age of eighty-three. Her brother, Willy Dreyfus, was Co-Executor of her estate until his death in 1977.

**Nathan Family Pursues Nazi-Era Claims**

Martha Nathan and later her estate successfully pursued restitution and damages for wartime losses that resulted from Nazi persecution. Willy Dreyfus also actively pursued compensation for his family's wartime losses and even filed a civil action in U.S. Federal Court in 1973 to obtain further compensation for his interest in the family's German banking firm which allegedly was sold in 1938 under duress for below its actual value. *Dreyfus v. Von Finck*, 534 F.2d 24 (2nd Cir. 1976), *cert. denied* 429 U.S. 835 (1976).

In 1999, the American Association of Museums adopted the Guidelines Concerning the Unlawful Appropriation of Objects During the Nazi Era (the "Guidelines) (Pl.'s Mot., Ex. B). Pursuant to the Guidelines, TMA posted on its website artwork having a Nazi-era provenance.

Defendants contacted TMA about the Painting in May 2004 and asserted a claim of ownership. TMA provided Defendants with the information it had collected about the Painting's provenance and, in 2005, TMA rejected Defendants' claims of ownership. TMA brought this quiet title action in January 2006, seeking a declaratory judgment and a permanent injunction against legal or other actions brought by Defendants regarding the Painting. Defendants bring counterclaims for conversion, restitution and a declaratory judgment.

The distant heirs of Martha Nathan now demand possession of the Painting or compensation for their claimed loss. TMA argues that no claim of ownership was asserted to the Painting for more than sixty-six years during which time any relevant statute of limitations has long run. Specifically, TMA asserts Defendants' claim of ownership is barred by the Ohio four-year statute of limitations.

### CHOICE OF LAW

Ohio's choice of law rules determine what law governs this action. "[A] federal court sitting in diversity must apply the choice of law rules of the state in which it sits." *Charash v. Oberlin College*, 14 F.3d 291, 296 (6th Cir. 1994) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Ohio's choice of law rules, the Ohio statute of limitation applies to this case. A federal court sitting in Ohio applies the procedural law of the forum state including the forum's statute of limitations even if the case requires application of another state's substantive law. *Charash*, 14 F.3d at 299 (citing *Howard v. Allen*, 30 Ohio St. 2d 130, 133 (1972)); *Metz v. Unizan Bank*, 416 F. Supp. 2d 568, 573-74 (N.D. Ohio 2006).

5

**DECLARATORY RELIEF IS APPROPRIATE**

**Statute of Limitations Bars Defendants' Recovery**

TMA has moved to dismiss Defendants' Counterclaim. Defendants allege three separate causes of action: declaratory relief, restitution and conversion. "Actions for declaratory judgment are neither legal nor equitable claims, but are considered to be sui generis" and "must accompany the substantive claim for which the declaratory judgment is sought." *QSI-Fostoria DC, LLC v. General Electric Capital Business Asset Funding Corp.*, No. 3:02 CV 7466, 2005 WL 81902, at n.3 (N.D. Ohio 2005). The Sixth Circuit has held that "[b]ecause a declaratory judgment action is a procedural device used to vindicate substantive rights, it is time-barred only if relief on a direct claim would also be barred." *International Ass'n of Machinists and Aerospace Workers v. Tennessee Valley Authority*, 108 F.3d 658, 668 (6th Cir. 1997). Under this analysis, Defendants' request for declaratory relief is barred if the underlying substantive claims for restitution and conversion are barred by the statute of limitations.

Defendants argue that this result is inequitable if TMA's request for declaratory judgment is not similarly barred. The Court disagrees. TMA's request for declaratory relief is barred only if its underlying claim to quiet title is barred. However, Ohio law does not impose a statute of limitations or laches defense to quiet title actions where plaintiff is in posession. *Chambers v. Wilcox*, 15 Ohio Dec. 629, 632 (Ohio Com. Pl. 1905) (an action to quiet title is a "special proceeding whose object is to challenge and provoke any causes of action which may exist" and, when this is the petition's sole purpose, no statute of limitations applies); *Klar v. Hoopingarner*, 62 Ohio App. 102, 106 (1939) (defense of laches is not available against the party in possession). Because the underlying claim in TMA's request for a declaratory judgment is not barred, its Complaint for Declaratory Judgment is likewise not barred.

6

The underlying claims in Defendants' request for declaratory judgment are restitution and conversion, each governed by Ohio Revised Code §2305.09(B). This statute requires actions "for the recovery of personal property" be brought within four years after the cause of action accrues.[2]

Claims for the recovery of personal property accrue when "the wrongdoer is discovered." *Investors REIT One v. Jacobs*, 46 Ohio St. 3d 176, 180 (1989). Under this "discovery rule," claims accrue when the claimant "discovers or, in the exercise of reasonable care, should have discovered the complained-of injury." *Id.* at 181; *Hambleton v. R.G. Barry Corp.*, 12 Ohio St. 3d 179, 181 (1984) ("If a person has knowledge of such facts as would lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry, and he fails to do so, he is chargeable with knowledge which by ordinary diligence he would have acquired") (citation omitted); *Copeland v. Delvaux*, 89 Ohio App. 3d 1, 6 (1993) ("Information sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due diligence") (citation omitted).

In the instant case, Martha Nathan pursued restitution and damages immediately after the war for property she lost as a result of Nazi persecution, but did not file a claim for the Painting. If she believed she had a claim to the Painting, she could have investigated and brought suit back then. Up to her death in 1958, twenty years after the alleged sale, she did not challenge the art dealers' purchase or the subsequent sale to TMA. TMA did not try to hide its possession of the Painting and Martha Nathan knew better than anyone the facts surrounding her own purported sale. The Painting was

---

[2] The Court acknowledges the strong public policy to resolve claims for Nazi-era artwork. However, unlike some states, Ohio law does not contain a special statute of limitations for Nazi-era artwork. *See* Cal. Civ. Proc. Code § 354.3 (granting heirs the right to sue galleries and museums for the return of Nazi-era artwork until 2010). This Court does not sit as a "super-legislature" to rewrite state laws. *Evans v. Abney*, 396 U.S. 435, 447 (1970) (federal courts' responsibility "is to construe and enforce the Constitution and laws of the land as they are and not to legislate social policy on the basis of our own personal inclinations"); *Watson v. Kenlick Coal Co., Inc.,* 498 F.2d 1183, 1187 (6th Cir. 1974).

acquired from her by acquaintances who, like her, were Jews who suffered during Nazi-era Germany. Any fraud, duress or wrongdoing would or should have been known at the time the art dealers' acquired the painting.³ Even if, for some unexplained reason, she could not discover any wrongdoing at that time, once the chaos of World War II Europe subsided, a reasonable and prudent person would have made further inquiry into the terms of her sale to the art dealers. Defendants, heirs to the Nathan estate, are imputed with knowledge of her interest. *Schwartz v. Cincinnati Museum Ass'n*, 35 Fed. Appx. 128, 131 (6th Cir. 2002).

Even if Defendants were not imputed with Martha Nathan's knowledge, they too should have made inquiry into the Painting's provenance well before 2002. Martha Nathan passed away in 1958, at which time an accounting of her estate was made and **additional** Holocaust-related claims were made by her Executor (Compl. ¶65.3). Defendants themselves cite to the numerous Congressional hearings held on the issues of Nazi-era artworks beginning in 1998 (Defs' Opp. 4). At the very latest, sixty years after the sale of the Painting, the public debate surrounding Nazi-era assets should have led the Nathan heirs to inquire into the location of her former assets. Based upon Martha Nathan's own previous claims, as well as those of her estate, the heirs knew she was persecuted by the Nazis and sustained wartime losses. This knowledge would have led a reasonable person to make further inquiries. These inquiries and ordinary diligence would have revealed the sale of the Painting in 1938. Certainly by 1998, at the latest, Defendants had sufficient notice to alert them to the possibility of wrongdoing surrounding the Painting.

---

³

*See Firsdon v. Mid-American National Bank & Trust Co.*, No. 90WD083, 1991 WL 254218, at *4 (Oct. 11, 1991). In *Firsdon*, the defendant, a grain farmer, was contractually obligated to give his landlord half of his grain crop or half of the proceeds from its sale. *Id.* at *2. Defendant rightfully raised the grain, stored it, and then sold it. *Id.* However, the proceeds wrongfully went to two other creditors, not the landlord, and the landlord filed claims against defendant seven months later. *Id.* The court held the landlord discovered or should have discovered the conversion at the time of the sale even though he was not a party to the sale. *Id.* at 4. Here, Martha Nathan was herself a party to the sale making even stronger the application of the limitations.

At least one other court has made a similar finding. In *Adler v. Taylor*, No. CV 04-8472-RGK, 2005 WL 4658511, at *4 (C.D. Cal. 2005), the plaintiffs lost a painting due to Nazi persecution and the painting was subsequently purchased by the defendant in 1963. The court held California's three-year statute of limitations would begin to run when the defendant acquired the property, or when, applying the discovery rule, "by exercise of reasonable diligence" the plaintiffs should have discovered the facts forming the basis of their cause of action. *Id*. In applying the discovery rule, the court considered three "key facts:" (1) the world knew plaintiffs had once owned the painting; (2) plaintiffs knew the painting was lost or stolen; (3) defendant's purchase and ownership was public knowledge and easily discoverable. *Id*. The court concluded that with reasonable diligence, the plaintiffs would have discovered their claim in 1963 when the painting was sold to defendant.

Similarly, Defendants here knew or should have known Martha Nathan had once owned the Painting, a fact publicized by both TMA and the art dealers; Defendants knew the Painting was no longer in the family's possession for some time; and TMA's ownership and possession was public knowledge and easily discoverable. As in *Adler*, by exercise of reasonable diligence, Martha Nathan would have known she had a claim against TMA shortly after the sale to TMA in 1939. The undisputed fact that she, and later her estate, did file claims for Nazi-era losses, but did not pursue recovery of the Painting is strong evidence that the purchase by TMA was not considered suspect.

Based upon the dates alleged in Defendants' Answer, no matter what date is selected, whether 1938 when the Painting was sold by Martha Nathan, 1939 when TMA purchased the Painting, 1958 when Martha Nathan died and her estate was opened, or at the very latest, 1998 when Congress began to discuss the issue in a highly publicized forum, Defendants' claims are time barred well before their filing in 2006. These undisputed facts and dates create an insurmountable bar to relief.

**TMA Did Not Waive Its Defenses**

Defendants' primary argument is that TMA voluntarily relinquished its statute of limitations and laches defenses. This waiver claim is based upon the American Association of Museum Guidelines which were adopted to assist museums in addressing issues raised by holding Nazi-era artworks in their collections. The Guidelines were meant to address unlawful appropriation of cultural objects during the Nazi-era without restitution. Pursuant to the Guidelines, TMA posted the Painting on its website. As a result, Defendants contacted TMA regarding the Painting in May 2004. Thereafter, TMA investigated the provenance of the Painting and concluded that Defendants' claim to the Painting was without merit. Defendants were informed of this decision in July 2005 when their claim was rejected.

Defendants claim the adoption of the Guidelines waived TMA's defense of the statute of limitations, and that the critical time for computing the statute of limitations is July 2005 when TMA rejected Defendants' claim or, at the earliest, when Defendants first contacted TMA about the Painting back in May 2004. Either date is well within the four-year limitations period of Ohio Revised Code §2305.09.

Defendants' position is that the act of posting artwork, including this Painting, on the TMA website was a general invitation to the public to come forward, make a claim, and collect damages. The Court rejects this argument. Under Ohio law, a waiver is a "voluntary relinquishment of a known right, with the intent to do so." *City of N. Olmsted v. Eliza Jennings, Inc.*, 91 Ohio App. 3d 173, 180 (1993). Defendants must prove a waiver based on "clear, unequivocal, decisive act by the other party." *Id.* at 180. The Guidelines were not intended to create legal obligations or mandatory rules but rather were intended to "facilitate the ability of museums to act ethically and legally as stewards" through "serious efforts" on a "case by case basis" (Pl.'s Mot., Ex. B, at General Principles, Acquisitions). The Guidelines are "intended to assist museums in addressing issues relating to objects

that may have been unlawfully appropriated during the Nazi era," but should not be interpreted to place an undue burden on the museums (*Id.*). Pursuant to the Guidelines, TMA carried out research which it shared with Defendants. The posting of Nazi-era artwork by TMA was not an automatic waiver, and TMA did not "elect" to waive its defenses which the Guidelines specifically provide it "may" do if and when presented with a meritorious claim (Pl.'s Mot., Ex. B, at Claims of Ownership). Indeed, instead of waiving these defenses, TMA filed this lawsuit specifically asserting these defenses. Therefore, even accepting all factual allegations in Defendants' pleading as true, the Court finds there has been no voluntary and intentional relinquishment of these defenses by TMA.

## CONCLUSION

Based on the foregoing, Defendants can prove no set of facts that entitle them to relief. Their claims were not brought within the applicable statute of limitations. Therefore, Plaintiff's Motion to Dismiss (Doc. No. 29) is granted and, pursuant to Federal Civil Rule 12(b)(6), the Counterclaims are dismissed with prejudice for failure to state a claim.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

December 28, 2006

11